UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
PAMELA SMART,

                                    Plaintiff,

        - against -

ANTHONY ANNUCCI, COMMISSIONER OF          **OPINION & ORDER**
DOCCS; JOSEPH JOSEPH, SUPERINTENDENT
OF BHCF; DONALD VENETTOZZI, DOCCS'           No. 19-CV-7908 (CS)
DIRECTOR OF INMATE DISCIPLINARY AND
SPECIAL HOUSING; ERIC GUTWEIN, DOCCS'
COMMISSIONER'S HEARING OFFICER;
SERGEANT CORBIE, BHCP 10507 SERGEANT,
INDIVIDUALLY AND IN THEIR OFFICIAL
CAPACITIES,

                                    Defendants.
--------------------------------------------------------------x

Appearances:

Pamela Smart
Bedford Hills, New York
*Pro Se Plaintiff*

Jessica Acosta-Pettyjohn
New York State Office of the Attorney General
New York, New York
*Counsel for Defendants*

Seibel, J.

        Before the Court is Defendants' motion to dismiss Plaintiff's Amended Complaint. (Doc.

26.) For the following reasons, Defendants' motion is GRANTED.

# I.    **BACKGROUND**

## A.    **Facts**

        For the purposes of the instant motion, I accept as true the facts, but not the conclusions,

set forth in Plaintiff's Amended Complaint, (Doc. 25 ("AC")), her original Complaint, (Doc. 2),

and her memorandum in opposition to the motion, (Doc. 28 ("P's Mem.")).  *See Washington v. Westchester Cnty. Dep't of Correction*, No. 13-CV-5322, 2015 WL 408941, at *1 n.1 (S.D.N.Y. Jan. 30, 2015) (court may consider facts from *pro se* plaintiff's original complaint even if they have not been repeated in amended complaint); *Braxton v. Nichols*, No. 08-CV-8568, 2010 WL 1010001, at *1 (S.D.N.Y. Mar. 18, 2010) ("[A]llegations made in a *pro se* plaintiff's memorandum of law, where they are consistent with those in the complaint, may also be considered on a motion to dismiss.").[1]

Plaintiff Pamela Smart is an inmate at Bedford Hills Correctional Facility ("Bedford"), where she has been confined continuously since March 11, 1993.  (AC ¶ 2.)  Plaintiff states that her cell was searched by two non-party corrections officers on April 20, 2017, and that the officers confiscated several pills as a result of that search.  (*Id.* ¶¶ 14-15.)  Plaintiff alleges that the pills were Tramadol, and were prescribed to her by her physician at Bedford, Dr. Gomprecht. (*Id.*)  Plaintiff immediately informed the two officers, as well as a sergeant, that the medication was her prescribed Tramadol.  (*Id.* ¶ 15.)

Defendant Sergeant Corbie, who was certified to perform NIK narcotics tests, tested the pills the next day, April 21, 2017, but did not follow proper NIK testing protocol.[2]  (*Id.* ¶¶ 15-16.)  Therefore, Corbie incorrectly conducted and interpreted the test, recording a false positive result for morphine.  (*Id.* ¶¶ 16-17.)  Minutes after Corbie recorded his results, Plaintiff was handcuffed and escorted to Bedford's Special Housing Unit ("SHU") where she was locked in

---

[1] The Court will send to Plaintiff copies of all unpublished decisions cited in this Opinion and Order.

[2] NIK is a kit for field-testing suspected narcotics.  (*See* Doc. 2-1 at 142-46.)  Citations to page numbers in Docs. 2-1 and 2-2 refer to the page numbers generated by the Court's Electronic Filing System.

solitary confinement for 40 days.  (*Id.* ¶ 18.)  A misbehavior report was issued the same day she was taken to SHU, stating that six of the pills found in Plaintiff's cell had tested positive for morphine.  (*Id.* ¶¶ 21, 23.)  The misbehavior report, which incorrectly stated that the charges stemmed from a search conducted on April 21, 2017 at 1:00 p.m., (*id.* ¶ 22), charged Plaintiff with various prison rule violations, including excess/altered clothes, tampering with property, smuggling, drug possession, unauthorized legal assistance, and grievance/disciplinary documents.  (*Id.* ¶ 21; Doc. 2-1 at 119.)  The report stated that the officers had found, among other things, twenty-five pills in four plastic packets within a baby-powder container in Plaintiff's cell:  eleven Famciclovir, eight Tramadol and six "disintergrated [*sic*] unknown pills later testing positive for morphine."  (Doc. 2-1 at 119.)

During SHU rounds, Plaintiff told Bedford's then-Superintendent Kaplan, Defendant First Deputy Superintendent Joseph, and other prison officials that there was a mistake in the NIK testing, and repeatedly insisted that the pills were her prescribed medication.  (AC ¶ 19.) Plaintiff requested both verbally and through numerous letters that administrative staff allow her to send the pills for an independent test outside the prison at her expense, but her requests were denied.  (*Id.* ¶ 20.)  Plaintiff also wrote numerous letters to various authorities complaining about her treatment, including one in which she conceded that "the meds were prescribed to me (Tramadol), but were supposed to be taken at the med window."  (Doc. 2-1 at 102.)

On April 25, 2017, Defendant Commissioner's Hearing Officer ("CHO") Gutwein, who was specially brought into Bedford from Fishkill Correctional Facility for the purpose, commenced a Tier III Superintendent's disciplinary hearing.  (AC ¶ 25.)  Plaintiff pleaded not guilty, mentioned that the misbehavior report had the wrong date, and read prison regulations and supporting law into the record.  (*Id.* ¶¶ 25-27.)  Plaintiff requested several witnesses, cross

examined the non-party officer who searched her cell, and submitted several exhibits for her defense, including an affidavit from a chemist regarding NIK testing procedures and results. (*Id.* ¶¶ 28-30, 32, 36-40.) On May 30, 2017, a NIK representative named Miller was called as a witness and was cross examined by Plaintiff. (*Id.* ¶¶ 41-45.)

At the conclusion of the hearing, on May 30, 2017, CHO Gutwein found Plaintiff guilty only on the charge of drug possession. (*Id.* ¶¶ 47-48.) In the hearing disposition form, Gutwein stated that in reaching his decisions, he relied on 1) the misbehavior report of Officer Ward stating that a search of Plaintiff's cell recovered eight Tramadol pills and a substance which tested positive for morphine, 2) the testimony of Officer Ward stating that a search of Plaintiff's assigned cell recovered pills and she is not sure where they came from, 3) the testimony of Officer Burroughs stating that Inmate Smart was approved to provide legal assistance to other inmates, 4) the testimony of Dr. McCarthy stating he identified the pills and Tramadol has an opioid base and is controlled, 5) the testimony of Mr. Miller stating the testing principles for the NIK system, 6) the testimony of Inmate Smart stating the date of the report is wrong and the report does not give any specification of the charges with documents. (Doc. 2-1 at 152.) He concluded, "Substantial evidence shows that inmate Smart was in possession of Tramadol which is a controlled substance. The remaining charges on the misbehavior report were not supported by the misbehavior report or lacked evidence to support them." (*Id.* at 154.) CHO Gutwein ultimately sentenced Plaintiff to 60 days of keeplock, loss of packages, loss of phone, loss of commissary, and a two-month loss of good time. (AC ¶ 49.)

The hearing, which began four days after Plaintiff received her misbehavior report, was subject to numerous adjournments and delays and ultimately proceeded sporadically over a span of 40 days during which Plaintiff was administratively confined to SHU. (*Id.* ¶¶ 53, 213, 232.)

At the conclusion of the hearing, Plaintiff was transferred to cell 113B-7, which was located in a mental health unit. (*Id.* ¶ 52.)  Plaintiff appealed her sentence, and it was affirmed by Venettozzi in July 2017.  (*Id.* ¶¶ 13, 55, 66.)

Over the next few years, Plaintiff learned through FOIL requests that the tapes of her hearing were inaudible, rendering the transcript of her hearing largely unusable, and also that the pills in question had been destroyed.  (*Id.* ¶¶ 73-74, 79.)

### B.      <u>Procedural History</u>

In August 2017 Plaintiff filed an Article 78 petition in New York State Supreme Court in Albany challenging the denial of her administrative appeal on the drug possession charge.  (*Id.* ¶ 63.)  On May 29, 2018 the Court ordered a rehearing because the tape of the original hearing was inaudible.  (*Id.* ¶ 88; Doc. 2-2 at 120-23.)  On July 6, 2018, in response to petitioner's motion to reargue, the Attorney General's office later filed a letter stating that the rehearing could not happen because the evidence in question had been destroyed.  (AC ¶ 90; Doc. 2-2 at 128-29.)  Instead, prison officials expunged the discipline from Plaintiff's records.  (Doc. 2-2 at 128-29.)  Additionally, in September 2018 Plaintiff filed a lawsuit in the New York Court of Claims dealing with the same facts as the instant case and seeking damages for state law violations.  (AC ¶ 9.)  That case was ultimately dismissed on March 5, 2019 because of the state statute of limitations, (*see* Doc. 2-2 at 132-40), and Plaintiff learned of that outcome on May 10, 2019, (AC ¶ 10).

Plaintiff filed the instant case on August 22, 2019.  She filed her original complaint, (Doc. 2), along with approximately 440 pages of supporting documents, (Docs. 2-1, 2-2).  On January 6, 2020, Defendants submitted a pre-motion letter requesting a conference to discuss their proposed motion to dismiss, and Plaintiff submitted her response on January 23.  The Court

held a pre-motion conference on January 31, 2020, at which I granted Plaintiff leave to file an amended complaint.  (Minute Entry of Jan. 31, 2020.)

Plaintiff submitted her Amended Complaint on May 8, 2020, for which she received clerical and logistical support with typing and exhibit assembly, although no legal or substantive help, from her one-time attorney, Robert E. Juceam.  (Docs. 21, 22.)  Defendants submitted their motion to dismiss and memorandum of law, (Doc. 27 ("Ds' Mem.")), on June 30, 2020.  Plaintiff then submitted her response memorandum, (P's Mem.), on July 29, 2020, and Defendants submitted their reply, (Doc. 29 ("Ds' Reply")), on August 14, 2020.

## II.   LEGAL STANDARD

### A.   Motion to Dismiss for Failure to State a Claim

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted).  While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 556 U.S. at 678-79.

6

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" *Id.* (alteration omitted) (quoting Fed. R. Civ. P. 8(a)(2)).

When deciding a motion to dismiss, a court is entitled to consider:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents integral to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint . . . , and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

*Weiss v. Inc. Vill. of Sag Harbor*, 762 F. Supp. 2d 560, 567 (E.D.N.Y. 2011) (internal quotation marks omitted).

### B.    Pro Se Plaintiffs

Complaints made by *pro se* plaintiffs are to be examined with "special solicitude," interpreted "to raise the strongest arguments that they suggest," *Shibeshi v. City of N.Y.*, 475 F. App'x 807, 808 (2d Cir. 2012) (summary order) (emphasis and internal quotation marks omitted), and "held to less stringent standards than formal pleadings drafted by lawyers," *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (*per curiam*) (internal quotation marks omitted).  Nevertheless, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," and

district courts "cannot invent factual allegations" that the plaintiff has not pleaded.  *Chavis v. Chappius*, 618 F.3d 162, 170 (2d Cir. 2010) (internal quotation marks omitted).

## III.   <u>DISCUSSION</u>

In her Amended Complaint, Plaintiff raises what she says are seven causes of action.  Six allege deprivation of her right to due process under the Fifth and Fourteenth Amendments, based on various alleged irregularities occurring during her disciplinary proceedings.  (*See* AC at 22, 28, 37, 39, 40, 46.)  The remaining claim purports to arise under New York State and Department of Corrections and Community Supervision ("DOCCS") policy.  (*See id.* at 35.) While the lines between these causes of action are rather blurred, Plaintiff's case essentially revolves around the incorrectly performed NIK test and allegedly false morphine test results introduced at her hearing.  She bases a number of her claims on the denial of her requests to send the pills to an independent lab for confirmatory testing, and states that because the test results were a false positive, there was no substantial evidence to support the drug possession charge of which she was found guilty.

In addition, Plaintiff asserts a number of evidentiary issues with her hearing, including that there were breaches in the chain of custody for the seized pills, that she was not provided photos of the contraband with her misbehavior report or at any time at the hearing, and that Defendant Sergeant Corbie, who performed the test, did not testify at Plaintiff's hearing. Further, she states that the misbehavior report was a defective charging instrument because it listed the wrong date and time of the incident.  She also bases her claims on her hearing officer subjecting her to unnecessary delays and invalid extensions, the prison's failure to properly electronically record her hearing, and her confinement without consent, both in administrative segregation in SHU and as a result of her 60-day keeplock sentence.

Defendants move to dismiss the Amended Complaint under several theories.  First, they argue that Plaintiff has not pleaded an adequate deprivation of a liberty interest under the Due Process clause; next, that she has received all the process she was due; third, that Defendants Annucci, Venettozzi, and Joseph were not personally involved in any alleged constitutional violation; and fourth, that the remaining defendants are entitled to qualified immunity.

### A.     Personal Involvement

Defendants argue that Plaintiff's Amended Complaint must be dismissed against Defendants Annucci, Joseph, and Venettozzi because they were not personally involved in any alleged violation of Plaintiff's constitutional rights.  (Ds' Mem. at 7-8.)  "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (internal quotation marks omitted).  Plaintiff essentially admits that she is suing Annucci and Joseph because, as high-ranking prison officials, she informed them about the "numerous due process violations related to the report of her alleged misbehavior" and the "prejudicial delays in her hearing," and they did not act to remove her from SHU or address those violations.  (AC ¶¶ 13 (A)(i-ii), (B) (i-iv).)  Similarly, she is suing Venettozzi because he denied her administrative appeal and affirmed the outcome of her hearing.  (*Id.* ¶ 13 (C)(i-ii).)

Since Defendants filed this motion, the Second Circuit has clarified that under the Supreme Court's ruling in *Iqbal*, "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676).  Merely being in the chain of command is not enough to satisfy this standard.  *See id.*  While "'[t]he factors necessary to establish a [§ 1983] violation will vary with the constitutional

provision at issue' because the elements of different constitutional violations vary," *id.* (quoting *Iqbal*, 556 U.S. at 676) (second alteration in original), "[t]he violation must be established against the supervisory official *directly*." *Id.* (emphasis added).  Failing to correct another officer's violation does not suffice.  *Id.* at 617 n.4.  Indeed, even before *Tangreti*, affirming the outcome of a prison hearing was not sufficient to establish personal involvement.  *See Abdur-Raheem v. Selsky*, 598 F. Supp. 2d 367, 370 (W.D.N.Y. 2009) (collecting cases).

That Annucci and Joseph failed to act on Plaintiff's complaints, and that Venettozzi denied Plaintiff's administrative appeal, cannot support the inference that these Defendants, through "[their] own individual actions, [have] violated the Constitution."  *Tangreti*, 983 F.3d at 615 (quoting *Iqbal*, 556 U.S. at 676).  Plaintiff has pleaded no facts that any individual defendant here, save for conceivably CHO Gutwein, who was her hearing officer, and Sergeant Corbie, who performed the allegedly incorrect test, had any personal involvement in the decisions which supposedly denied her due process of law.  Accordingly, the claims against Annucci, Joseph and Venettozzi are dismissed.

### B.     Due Process

I next turn to whether Plaintiff has plausibly stated a claim for a violation of due process against the remaining Defendants.  To survive a motion to dismiss, a plaintiff must plead "that the state has created a protected liberty interest and that the process due was denied."  *Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir. 1998).  I turn first to whether Plaintiff has adequately pleaded a protected liberty interest.

#### 1.     Deprivation of a Liberty Interest

"To identify a protectable liberty interest . . . , prisoners must establish that a given restraint imposes an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'"  *Id.* at 136 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)).

Relevant factors in determining what constitutes an "atypical and significant hardship" include "(1) the effect of disciplinary action on the length of prison confinement; (2) the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions; and (3) the duration of the disciplinary segregation imposed compared to discretionary confinement." *Id.* (citing *Sandin*, 515 U.S. at 484).  In other words, "[b]oth the conditions and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical."  *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (quoting *Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999)); *see id.* ("The conditions of confinement are a distinct and equally important consideration in determining whether a confinement in SHU rises to the level of 'atypical and severe hardship.'") (quoting *Ortiz v. McBride*, 323 F.3d 191, 195 (2d Cir. 2003) (*per curiam*)).

a.   <u>Pre-Hearing SHU Confinement</u>

Courts in this Circuit consistently hold that 100 days or less of solitary confinement, absent harsher than normal conditions, does not constitute an atypical and significant hardship giving rise to a protected liberty interest.  *See Borcsok v. Early*, 299 F. App'x 76, 78 (2d Cir. 2008) (summary order) (101 days in the SHU "was neither atypical nor significant"); *Sealey*, 197 F.3d at 589 (SHU conditions are "doubtless unpleasant and somewhat more severe than those of general population, but the degree of incremental harshness, endured for 101 days, is not an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life'") (quoting *Sandin*, 515 U.S. at 484); *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 375 (N.D.N.Y. 2010) (90 days "fall within the 'short range' of disciplinary confinement and thus implicate a liberty interest only if 'the conditions were more severe than the normal SHU conditions'") (quoting *Palmer*, 364 F.3d at 65); *Walker v. Caban*, No. 08-CV-3025, 2008 WL

11

4925204, at *11 (S.D.N.Y. Nov. 19, 2008) (ninety days in SHU not atypical or significant), *report and recommendation adopted*, 2008 WL 5148794 (S.D.N.Y. Dec. 5, 2008).

There is no "bright line rule," however, "that . . . certain period[s] of SHU confinement automatically fail[] to implicate due process rights." *Palmer*, 364 F.3d at 64; *see Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir. 2000). Indeed, "SHU confinements of fewer than 101 days may constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions . . . or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer*, 364 F.3d at 65; *see Jackson v. Ricks*, No. 02-CV-00773, 2006 WL 2023570, at *19 (N.D.N.Y. July 18, 2006) (collecting cases).

In determining whether Plaintiff has plausibly alleged an atypical and significant hardship, I am "required to examine the conditions of confinement 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.'" *Davis v. Barrett*, 576 F.3d 129, 133-34 (2d Cir. 2009) (quoting *Welch v. Bartlett*, 196 F.3d 389, 393 (2d Cir. 1999)). While district courts must "undertake extensive fact-finding in determining whether a liberty interest has been affected," *Rivera v. Wohlrab*, 232 F. Supp. 2d 117, 121 (S.D.N.Y. 2002), "when the conditions are uncontested . . . a district court [may] resolve the issue of atypicality of confinement as a matter of law," *Davis*, 576 F.3d at 134.

Here, Plaintiff was in SHU for approximately 40 days, well below the benchmark that may typically implicate a liberty interest, and she does not suggest anywhere that her conditions were harsher than normal SHU conditions, or that her "relatively brief confinement[] under

normal SHU conditions" was atypical in relation to the ordinary incidents of prison life.  *Palmer*, 364 F.3d at 65.

Plaintiff's Amended Complaint states only that it is "normal protocol at [Bedford] that, when disciplinary charges do not carry a potential SHU confinement sanction, inmates awaiting disciplinary hearings are not pre-confined at all" and that even "[i]n cases where there has been violent behavior, inmates are often pre-hearing confined in their cells on regular housing units under far less-restrictive conditions than in SHU."  (*Id.* at 12.)

While it may be true that her placement in SHU was unusual compared to other similarly situated inmates, I find that Plaintiff has not pleaded sufficient facts about the atypicality of her conditions to show she has plausibly been denied a protected liberty interest.  *Compare, e.g.*, *McGriff v. Keyser*, 2019 WL 6033421, at *2 (S.D.N.Y. Nov. 13, 2019) (plaintiff in SHU alleging "food that was contaminated with hair and construction-related debris, as well as disturbances caused by loud construction noises, for which inmates were not provided any earplugs" did not plead a deprivation of a liberty interest).

### b.      Post-Hearing Keeplock Sentence and Cell Location Transfer

Additionally, there is nothing in Plaintiff's Amended Complaint or Memorandum suggesting that her sentence of 60 days keeplock (of which she served 20), (AC ¶¶ 272, 274), constituted an atypical and significant hardship in relation to the ordinary incidents of prison life. Plaintiff fails to plead any facts suggesting that the conditions she experienced during keeplock were atypical.

Plaintiff also states that after the conclusion of her hearing she was moved to a new cell location, which was in a mental health unit, for a year.  (*Id.* ¶ 52.)  There, Plaintiff alleges "she was exposed to constant disruptive behavior, outbursts at all hours of the days and nights –

which caused her sleep deprivation – violence, and frequent lock downs." (*Id.* ¶ 280.) She does

not elaborate as to how or why she was allegedly placed there, or how that placement relates to

the disposition at her disciplinary hearing, other than the conclusory statement that she was

moved "for no other reason than to continue her punishment and suffering." (*Id.*)

The Supreme Court, however, has repeatedly upheld the notion that "the transfer of an

inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the

terms of confinement ordinarily contemplated by a prison sentence." *Hewitt v. Helms*, 459 U.S.

460, 468 (1983); *see Maguire v. Coughlin*, 901 F. Supp. 101, 105 (N.D.N.Y. 1995). Indeed,

"[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within

the sentence imposed" and is "not otherwise violative of the Constitution," due process "does not

require hearings in connection with transfers" even when "they are the result of the inmate's

misbehavior or may be labeled as disciplinary or punitive." *Montanye v. Haymes*, 427 U.S.

236, 242 (1976); *see Cooper v. City of N.Y.*, No. 13-CV-7590, 2014 WL 5315074, at *3-5

(S.D.N.Y. Oct. 17, 2014) (plaintiff alleging "pain, suffering, extreme emotional distress, fear,

and deprivation" caused by transfer to Crips-designated housing unit without any explanation did

not have protected liberty interest under Due Process Clause).

Even if the transfer to the mental health unit was part of her sentence for the disciplinary

violation, I conclude, drawing on my "judicial experience and common sense," *Iqbal*, 556 U.S. at

679, that lockdowns, noise, and bad behavior by other prisoners are not atypical in prison life.

*See, e.g., Fiorito v. Entzel*, No. 17-CV-2158, 2019 WL 1446403, at *5 (C.D. Cal. Mar. 27, 2019)

("Transfer to a prison with more violence and lockdowns also does not amount to an atypical and

significant hardship."), *report and recommendation adopted*, 2019 WL 1438067 (C.D. Cal. Mar.

29, 2019); *Warner v. Cate*, No. 09-CV-1568, 2010 WL 3220381, at *3 (E.D. Cal. Aug. 13, 2010)

(assignment to prison with frequent lockdowns, more violent inmates, and more restrictive policies does not rise to level of atypical and significant hardship in relation to the ordinary incidents of prison life).

c. <u>Job Assignment and Other Privileges</u>

Plaintiff also alleges that because of her erroneous discipline, she was "removed . . . from her prison job as an HIV/AIDS counselor," (AC ¶ 275), lost her commissary, phone, and package privileges for 100 days, (*id.* ¶ 277), and missed out on a family reunion trailer visit with her elderly parents, (*id.* ¶ 278).  The law is clear, however, that prisoners do not have protected liberty interests in job assignments, visits, or other privileges.  *See Frazier v. Coughlin*, 81 F.3d 313, 318 (2d Cir. 1996) ("[I]n New York a prisoner has no protected liberty interest in a particular job assignment."); *Baxter v. Wagner*, No. 19-CV-6077, 2020 WL 6018788, at *3 (W.D.N.Y. Sept. 21, 2020) ("temporary deprivations of privileges, such as commissary trips and telephone use, do not meet the standard of an atypical and significant hardship.") (internal quotation marks omitted); *Hammock v. Rizzuto*, No. 20-CV-4175, 2020 WL 3414928, at *1 (S.D.N.Y. June 22, 2020) ("A prisoner has no constitutional liberty interest in a particular job, and can be assigned or removed from his job for almost any reason."); *Zimmerman v. Burge*, No. 06-CV-176, 2008 WL 850677, at *2 (N.D.N.Y. Mar. 28, 2008) ("[T]here is abundant case law establishing that inmates have no liberty or property interest in contact visits.")

For all of these reasons, Plaintiff has not plausibly pleaded that she was deprived of a protected liberty interest, and her due process claims must be dismissed.

**2. Constitutionally Sufficient Process**

In an excess of caution, I will address whether Plaintiff was afforded constitutionally sufficient process.

15

a.   Pre-Hearing Administrative Segregation

As stated above, Plaintiff's confinement in SHU before and during her Tier III hearing was administrative in nature.  *See, e.g.*, *Proctor v. LeClaire*, 846 F.3d 597, 609 (2d Cir. 2017) ("Ad[ministrative] Seg[regation] is appropriate when necessary to . . . 'complet[e] . . . an investigation into misconduct charges.'") (quoting *Hewitt*, 459 U.S. at 476); *McGriff*, 2019 WL 6033421, at *5 (describing the differences in the due process protections for disciplinary versus administrative segregation); *El-Shabazz v. Wangenstein*, No. 92-CV-7291, 1995 WL 489686, at *5 (S.D.N.Y. Aug. 15, 1995) (placing plaintiff in administrative segregation pending a hearing on misconduct charges was "a reasonable response to concerns for institutional order and security"); *see also* 7 N.Y.C.R.R. § 270.3 (describing tiers of disciplinary hearings); 7 N.Y.C.R.R. § 301.3 (authorizing administrative segregation for inmate awaiting determination of superintendent's disciplinary hearing for Tier III violation); 7 N.Y.C.R.R. § 301.4 (authorizing administrative segregation resulting from a determination by the facility that the inmates' "continued presence in general population would pose an unreasonable and demonstrable risk to the safety and security of staff, incarcerated individuals, the facility or would present an unreasonable risk of escape").

"Administrative Segregation is not punitive, and thus is governed by less restrictive procedural protections" than disciplinary segregation.  *Colon v. Annucci*, 344 F. Supp. 3d 612, 636-37 (S.D.N.Y. 2018).  Assignment to administrative segregation requires only "some notice of the charges against [the inmate] and an opportunity to present [the inmate's] views to the prison official charged with deciding whether to transfer [the inmate] to administrative segregation."  *Taylor v. Rodriguez*, 238 F.3d 188, 192 (2d Cir. 2001) (internal quotation marks omitted) (quoting *Hewitt*, 459 U.S. at 476).  Once the inmate has had the opportunity to present

those views, "prison officials need only conduct 'an informal, nonadversary evidentiary review' of whether the confinement is justified." *Proctor*, 846 F.3d at 609 (quoting *Hewitt*, 459 U.S. at 476). The officials' final administrative segregation decision may "'turn[] largely on purely subjective evaluations and on predictions of future behavior,'" *id.* (quoting *Hewitt*, 459 U.S. at 474), but requires "some evidence" to support an administrative custody designation that is "reliable." *Taylor*, 238 F.3d at 194.

Plaintiff acknowledges that she told Bedford's then-Superintendent as well as four Deputy Superintendents when they came to SHU on rounds "that there was a mistake in the test because the medication confiscated from her cell was legitimately prescribed to her, and was certainly *NOT* morphine as reported from the preliminary NIK field test." (AC ¶ 19 (emphasis in original).) The day she was placed in SHU, Plaintiff also received her Tier III misbehavior report charging her with several prison rule violations. Thus, it appears Plaintiff received notice of the charges against her and an opportunity to present her views to prison officials charged with control over her administrative segregation in satisfaction of the first of *Taylor*'s minimum requirements. *McGriff*, 2019 WL 6033421, at *6.[3]

As for *Taylor*'s second prong, Plaintiff concedes in her Amended Complaint that the prison officials relied on the results of the NIK test in determining that she should be administratively confined. While Plaintiff rightly points out that the NIK test may have flaws and give false positives, courts in this district have repeatedly determined that NIK test results satisfy the some reliable evidence standard. *See, e.g.*, *Nichols v. Von Blanckensee*, No. 18-CV-

---

[3] Moreover, while Plaintiff alleges that Corbie's NIK test was the triggering incident that led to her confinement and that Gutwein's delays in conducting the hearing prolonged her confinement, she does not allege that either of them had any role in the decision to place her in administrative SHU confinement pending the hearing.

754, 2018 WL 4387558, at *2-3 (S.D.N.Y. Sept. 14, 2018); *Bolanos v. Coughlin*, No. 91-CV-5330, 1993 WL 762112, at *9-10 (S.D.N.Y. Oct. 15, 1993). I am therefore obligated here to give deference to the prison officials' determination that administrative confinement in SHU pending completion of her hearing was appropriate in this case. Further, the decision to segregate Plaintiff was made before she provided any evidence regarding the alleged errors in the testing procedure. Finally, putting the NIK test aside, Plaintiff admittedly had pills in her cell that she was not permitted to have, so a belief that that conduct presented a risk to institutional order and security was hardly unreasonable.

I therefore find no due process violation with respect to Plaintiff's SHU confinement.

   b. <u>Superintendent's Hearing and Post-Hearing Confinement</u>

The only process that an inmate is due at a disciplinary hearing is "advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citing *Wolff v. McDonnell*, 418 U.S. 539, 563-567 (1974)). Furthermore, "judicial review of the written findings required by due process is limited to determining whether the disposition is supported by 'some evidence.'" *Id.* (citing *Superintendent v. Hill*, 472 U.S. 445, 455 (1985). "This standard is extremely tolerant and is satisfied if 'there is *any* evidence in the record that supports' the disciplinary ruling." *Sira*, 380 F.3d at 69 (emphasis in original) (quoting *Friedl v. City of N.Y.*, 210 F.3d 79, 85 (2d Cir. 2000)).

Plaintiff's due process concerns center on her contention that she did not have adequate opportunity to challenge the test results on her contraband, and this violated her due process rights. Specifically, she contends that she was not allowed to conduct an independent test, that

CHO Gutwein failed to credit evidence she submitted regarding the unreliability or misreading of the test, and that he did not call Corbie, the testing officer, as a witness.

First, it appears from the Disposition Form that CHO Gutwein found Plaintiff guilty of drug possession because she possessed Tramadol in her cell, not morphine. (Doc. 2-1 at 154.) Even though Tramadol was prescribed to her by the prison physician, Plaintiff concedes she was not allowed to possess this medication, a synthetic opioid painkiller and controlled substance, away from the medication window. (Doc. 2-1 at 102.) This fact alone would render any alleged due process violation in relation to the morphine finding to be harmless error, as she would have been found guilty of possession of Tramadol even absent the NIK test results.

But even if the Tramadol pills were not the main reason for her guilty verdict, Plaintiff concedes that she was permitted to extensively participate in her defense and challenge the charges and testing, including her questioning of a witness from the NIK company who apparently was called at Plaintiff's request, (*see* Doc. 2-1 at 83); cross-examining the officer who searched her cell, and submitting several exhibits, including literature regarding NIK tests and false positives, an affidavit from a chemist, and a lengthy handwritten statement, (AC ¶¶ 28-30, 32, 36-45; Doc. 2-1 at 1-87.) Plaintiff alleges that she requested that Corbie testify, (AC ¶ 28), but a document on which she relies shows that she withdrew her request for all witnesses except for three, who did not include Corbie, (Doc. 2-1 at 83). *See L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (for the purposes of deciding a motion to dismiss, courts take allegations as true "unless contradicted by . . . documentary evidence . . . from the exhibits attached" to the complaint); *Perry v. NYSARC, Inc.*, 424 F. App'x 23, 25 (2d Cir. 2011) (courts need not accept as true "factual assertions that are contradicted . . . by documents upon which the

pleadings rely").[4]  Further, prisoners have no due process right to independent, outside testing of suspected drugs.  *See Mansa v. United States*, No. 16-CV-644, 2019 WL 121681, at *10 (D. Conn. Jan. 7, 2019) ("[A]s a matter of law, prisoners do not have a due process right to engage in secondary testing.") (internal quotation marks omitted) (collecting cases); *Manfredi v. United States*, No. 12-CV-1905, 2012 WL 5880343, at *6 (D.N.J. Nov. 20, 2012) (no due process right to independent lab test) (collecting cases); *see also Spence v. Farrier*, 807 F.2d 753, 756 (8th Cir. 1986) ("To allow prisoners to present expert testimony in regard to [test kit] reliability would seriously interfere with the institutional goal of drug deterrence and prompt resolution of drug related infractions . . . .  Although it is conceivable that an inmate could be unjustly disciplined as a result of EMIT tests, the margin of error is insignificant in light of institutional goals.").

Lastly, the due process clause requires only that there be "some evidence" that is "reliable" in the record to support the disciplinary conviction.  *Sira*, 380 F.3d at 69.  The test results,[5] coupled with the misbehavior report and witness testimony, (*see, e.g.*, AC ¶¶ 21, 23, 28), satisfy the minimal "some evidence" standard, *see Eleby v. Selsky*, 682 F. Supp. 2d 289, 293

---

[4] Plaintiff alleges that because the hearing was conducted only sporadically and was taking so long, she was "by May 30, 2017, effectively coerced into abandoning her request to call other witnesses . . . ." (AC ¶ 232.)  But the letter in which she withdrew her request for witnesses other than the three is dated April 29, 2017, (Doc. 2-1 at 83), only eight days after the misbehavior report was issued.  She plainly abandoned her desire for Corbie's testimony well before her SHU confinement became lengthy.

[5] While Plaintiff bases the majority of her complaint on her contention that the NIK test produced a false positive, a credibility determination is "properly resolved by the hearing officer and is not a subject for independent review by [the district court]."  *Livingston v. Kelly*, 423 F. App'x 37, 40 (2d Cir. 2011) (summary order); *Nichols*, 2018 WL 4387558, at *2-3; *see also Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986) ("prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest").

(W.D.N.Y. 2010), and the hearing officer was allowed to rely on this evidence in reaching a guilty verdict.

Finally, Plaintiff also alleges that defects in the chain of custody form indicate that her due process rights were violated.  Essentially, her objections rest on inconsistencies between the chain of custody form and the Unusual Incident ("UI") report, as well as the fact that the entire chain of custody form seems to be written in one person's handwriting, instead of several individual notations by each person who handled the contraband as required by prison regulations.  (AC ¶¶ 132-47.)  While the Due Process Clause requires a disciplinary body to establish a reasonably reliable chain of custody, *Madera v. Goord*, 103 F. Supp. 2d 536, 540 (N.D.N.Y. 2000); *Soto v. Lord*, 693 F. Supp. 8, 19 (S.D.N.Y. 1988), the evidence here shows that this procedure was followed.  The chain of custody form indicates the time and date the samples were transferred between individuals, and, despite Plaintiff's assertions to the contrary, the UI report does not necessarily contradict it.  In any event, the issue of whether the chain of custody form was reasonably reliable was only peripherally relevant to Plaintiff's defense at her hearing. Plaintiff does not argue here that the substance that was tested was actually morphine that had somehow replaced the pills found in her cell due to carelessness, but rather that the test of the substance found in her cell was conducted and interpreted incorrectly (which in turn, is peripheral to the fact that the guilty verdict was based on her unauthorized possession of Tramadol).  Plaintiff acknowledges that she was able to raise objections and present her concerns about the chain of custody at her hearing.  For these reasons, Plaintiff's due process argument regarding the chain of custody form also fails. *Tal v. McGann*, No. 88-CV-7678, 1991 WL 113776, at *2-3 (S.D.N.Y. June 17, 1991).

C.     **State Law and Regulatory Violations**

Plaintiff also asserts that even absent a due process violation, her hearing and disciplinary process violated a number of state regulations, including undue delay, mistakes and typos in the misbehavior report,[6] lapses in chain of custody documentation, her inability to view photographs of the contraband, and prison officials' failure to electronically preserve the record and evidence for any appeals.  "[T]he law is settled," however, "that the failure to follow a [DOCCS] Directive or prison regulation does not give rise to a federal constitutional claim."  *Rivera*, 232 F. Supp. 2d at 123 (citing *Hyman v. Holder*, No. 96-cv-7748, 2001 WL 262665, at *6 (S.D.N.Y. Mar. 15, 2001)).  "Thus, a § 1983 claim brought in federal court is not the appropriate forum to urge violations of prison regulations . . . ; rather, in order to prevail on a § 1983 claim, the allegations asserted must constitute violations of constitutional due process standards."  *Id.* (citation omitted).

To the extent any of these regulations might support a state-law cause of action – an issue on which I express no opinion – the "traditional 'values of judicial economy, convenience, fairness, and comity'" weigh in favor of declining to exercise supplemental jurisdiction where all federal law claims are eliminated before trial.  *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118,

---

[6] Plaintiff also alleges that the misbehavior report was an inadequate charging instrument for purposes of due process because of discrepancies in the date and time noted on the report.  (AC ¶¶ 171-83.)  While incorrect dates on a misbehavior report can cause due process problems, *see Sira*, 380 F.3d at 71-72, the Second Circuit is clear that "one discrepancy in a misbehavior report can be excused" so long as the report meets the standard of providing "sufficient factual specificity to permit a reasonable person to understand what conduct is at issue so that he may identify relevant evidence and present a defense," *id.* (citing *Wolff*, 418 U.S. at 564).  Here, the misbehavior report makes clear that Plaintiff was being charged with rule violations as a result of the pills and other contraband found during the inspection of her cell.  This report meets the standard set out in *Sira*, allowing Plaintiff to understand what conduct was at issue, identify relevant evidence, and present a defense.

122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).

Having determined that the only claims over which this Court has original jurisdiction should be

dismissed, and having considered the factors set forth in *Cohill*, I decline to exercise

supplemental jurisdiction over Plaintiff's remaining state law causes of action.  *See id.* (citing 28

U.S.C. § 1367(c)(3)).  Any state-law claims are thus dismissed without prejudice.

### D.   Leave to Amend

Leave to amend a complaint should be freely given "when justice so requires."  Fed. R.

Civ. P. 15(a)(2).  "[I]t is within the sound discretion of the district court to grant or deny leave to

amend."  *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018) (internal quotation marks omitted).

"Leave to amend, though liberally granted, may properly be denied" for "'repeated failure to

cure deficiencies by amendments previously allowed'" or "'futility of amendment,'" among

other reasons.  *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman v.

Davis*, 371 U.S. 178, 182 (1962)).

Plaintiff has already amended once, after having the benefit of a pre-motion letter from

Defendants stating the grounds on which they would move to dismiss, (Doc. 18), as well as the

Court's observations during the pre-motion conference, (*see* Minute Entry dated Jan. 31, 2020).

In general, a plaintiff's failure to fix deficiencies in the previous pleading, after being provided

notice of them, is alone sufficient ground to deny leave to amend.  *See Nat'l Credit Union

Admin. Bd. v. U.S. Bank Nat'l Ass'n*, 898 F.3d 243, 257-58 (2d Cir. 2018) ("When a plaintiff was

aware of the deficiencies in his complaint when he first amended, he clearly has no right to a

second amendment even if the proposed second amended complaint in fact cures the defects of

the first.  Simply put, a busy district court need not allow itself to be imposed upon by the

presentation of theories *seriatim*.") (alteration, footnote, and internal quotation marks omitted);

*In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects in the Consolidated Amended Complaint by the defendants and given a chance to amend their Consolidated Amended Complaint," and "plaintiffs have not submitted a proposed amended complaint that would cure these pleading defects"), *aff'd sub nom. Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007) (*per curiam*) ("[P]laintiffs were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies.") (internal quotation marks omitted).

Further, Plaintiff has not asked to amend again or otherwise suggested that she is in possession of facts that would cure the deficiencies identified in this opinion.  *See TechnoMarine SA v. Giftports, Inc*., 758 F.3d 493, 505 (2d Cir. 2014) (plaintiff need not be given leave to amend if plaintiff fails to specify how amendment would cure the pleading deficiencies in the complaint); *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (district court did not err in dismissing claim with prejudice in absence of any indication plaintiff could or would provide additional allegations leading to different result); *Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249-50 (2d Cir. 2004) (*per curiam*) (district court did not abuse its discretion by not granting leave to amend where there was no indication as to what might have been added to make the complaint viable and plaintiffs did not request leave to amend).

Accordingly, the Court declines to grant leave to amend *sua sponte*.

**IV.**    **CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is GRANTED.  The Clerk of

Court is respectfully directed to terminate the pending motion, (Doc. 26), and close the case.

**SO ORDERED.**

Dated: January 26, 2021
         White Plains, New York

_____
    CATHY SEIBEL, U.S.D.J.